# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| STATE OF CONNECTICUT and ARTHUR J. ROCQUE, JR., COMMISSIONER OF THE CONNECTICUT DEPARTMENT OF ENVIRONMENTAL PROTECTION,<br>     Plaintiffs,<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF COMMERCE and THE HONORABLE DONALD L. EVANS, IN HIS CAPACITY AS SECRETARY OF COMMERCE,<br>     Defendants,<br><br>ISLANDER EAST PIPELINE COMPANY, LLC,<br>     Intervenor Defendant. | CIVIL ACTION NO.<br>3:04cv1271 (SRU) |

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Islander East Pipeline Company, LLC ("Islander") wants to build a 45-mile-long natural gas pipeline from Branford, Connecticut to a point in Suffolk County, Long Island (the "project"). The project would involve dredging a trench in the sea floor of Long Island Sound. In order to complete the project, Islander must obtain permits from the Federal Energy Regulatory Commission ("FERC") and the Army Corps of Engineers, which in turn require Islander to get coastal certification from both New York and Connecticut pursuant to the Coastal Zone Management Act ("CZMA"). The State of Connecticut and the Commissioner of the Connecticut Department of Environmental Protection ("Connecticut") objected to the certification. Islander appealed to the Secretary of Commerce ("Secretary"), who overturned Connecticut's objection, finding that the project was consistent with the CZMA. The three interested parties, Connecticut, the Secretary, and Islander have now filed cross-motions for

summary judgment, principally asking me to decide whether the Secretary's decision was arbitrary and capricious.

"[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal. The entire case on review is a question of law." *American Bioscience, Inc. v . Thompson*, 269 F.3d 1077, 1083-84 (D.C. Cir. 2001) (citation omitted). Judicial review of agency action is often accomplished by filing cross-motions for summary judgment. The question whether an agency's decision is arbitrary and capricious, however, is a legal issue, whether it is presented as a motion to dismiss or for summary judgment. *Id.*

## I.     Relevant Background

Islander wants to construct 45 miles of natural gas pipeline, 22 miles of which would be beneath the Long Island Sound, originating from a point in North Haven, Connecticut that interconnnects with the pipeline of Algonquin Gas Transmission, to a terminus in Suffolk County, New York. The pipeline would be 24 inches in diameter and would transport approximately 260,000 dekatherms (DTH) of natural gas per day to a gas company serving principally Long Island, and to a more limited extent, New York City. Islander intends to lay the pipeline using horizontal directional drilling (HDD) for 4,000 feet from a point on the Connecticut shore to an exit point on the near shore. From that point, Islander plans to dredge a 1.1 mile trench. The pipeline would then continue under waters greater than 20 feet deep for the remainder of its length. Islander proposes to place "back-fill" of sand and gravel over the pipeline and to use a subsea plow to bury the underwater pipeline.

The project would be sited in a region of the Connecticut coast among the Thimble Islands, which provides a habitat for fish, crabs, urchins, snails, sponges, mussels, oysters, clams,

and scallops. The Thimble Island region is "one of the most highly valuable, multiple marine ecological environments" along the coast of Connecticut. IE005688-89. The proposed pipeline route would impact up to 3,700 acres of Sound bottom, including commercially leased and potentially leasable shellfish habitats. Shellfish are a species of "considerable ecological, commercial or recreational importance" in the Southern New England and New York regions. IE00516; 00537. Connecticut is ranked number one on the East Coast for clam production. IE006095. Connecticut also ranks number one nationwide in the dollar value of its harvested oysters. *Id.*

Connecticut objected to Islander's certification that its project complied with Connecticut's coastal management plan. Islander filed an appeal of Connecticut's objection with the Secretary. Islander and Connecticut filed briefs and supporting materials with the Secretary, and the Secretary provided a notice and comment period and held a public hearing in New Haven, Connecticut. The Secretary closed the administrative record on April 15, 2004, and issued a written Decision and Findings on May 5, 2004 (the "Decision"). In the Decision, the Secretary determined that the project was consistent with the CZMA, thereby overruling Connecticut's objections.

## II.    Discussion

The State of Connecticut argues that the Secretary's Decision, determining that the project is consistent with the CZMA, was arbitrary and capricious. A project is consistent with the CZMA if it meets three requirements: (1) the activity furthers the national interest in a significant or substantial manner; (2) the national interest furthered outweighs the activity's adverse coastal effects; and (3) there is no reasonable alternative available. 15 C.F.R. § 930.121.

Connecticut argues that the Secretary's Decision on elements one and two was arbitrary and capricious, and additionally, in reaching his Decision, he did not follow procedural requirements. The defendants argue that the Secretary articulated a reasoned basis for his Decision on each of the three required elements.

A.    Arbitrary and Capricious Standard of Review

Jurisdiction is based on the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, which governs judicial review of agency action. The court will set aside agency action when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *American Petroleum Institute v. Knecht*, 609 F.2d 1306, 1310 (9th Cir. 1979) (applying arbitrary and capricious standard of review to Secretary of Commerce's decision regarding state coastal zone management plan).[1] The court will also set aside agency action found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). For an agency decision to withstand the arbitrary and capricious standard of review, an agency is required to:

> examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. In reviewing that explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given. We will, however, uphold a decision of less than ideal clarity if the

[1] The parties do not dispute that the arbitrary and capricious standard of review applies.

-4-

agency's path may reasonably be discerned.

*Islander East Pipeline Co., LLC v. Connecticut Dept. of Environmental Protection*, 482 F.3d 79, 94-95 (2d Cir. 2006) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983)).  "Additionally, 'courts may not accept appellate counsel's *post hoc* rationalizations for agency action.  It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'"  *Id.* at 95 (quoting *State Farm*, 463 U.S. at 50).

"The arbitrary and capricious standard of review is narrow and particularly deferential."  *Environmental Defense v. United States Environmental Protection Agency*, 369 F.3d 193, 201 (2d Cir. 2004).  Although an agency decision is "entitled to a presumption of regularity."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), that presumption does not shield the agency from "a thorough, probing, in-depth review."  *Id.*  The reviewing court should make a careful and searching inquiry of the facts, assessing whether the agency considered relevant factors.  *Id.* at 416.

The Second Circuit has instructed courts applying the arbitrary and capricious standard of review to consider whether the agency: (1) considered the relevant evidence; (2) examined relevant factors; and (3) spelled out a satisfactory rationale for its action, including demonstrating a reasoned connection between the facts and its decision.  *Environmental Defense*, 369 F.3d at 201.

B.    <u>Statutory Framework and Legislative History of the CZMA</u>

1.      *Statutory Framework of the CZMA*

In 1972, Congress enacted the Coastal Zone Management Act, "which provides funding for the development and implementation of state coastal zone management plans." *Norfolk Southern Corp. v. Oberly*, 822 F.2d 388, 391 (3d Cir. 1987). The CZMA is a voluntary program for states; if a state chooses to participate, the state develops and implements a coastal management plan according to the guidelines set forth in 16 U.S.C. § 1455. *See, e.g.*, Conn. Gen. Stat. § 22a-93 (delineating Connecticut's coastal zone management plan). Once the Secretary approves that plan, the state is eligible for federal funding, to use towards implementing the state plan.

In addition, the CZMA provides another incentive for state participation, namely, the consistency requirement – "a kind of reverse preemption provision that assures a state that, with certain exceptions, federal agency activities or federally-sponsored activities affecting the coastal zone will be consistent with the state-created and federally approved coastal management plan." JOSEPH J. KALO, ET AL., COASTAL AND OCEAN LAW 3D at 192 (2007) ("COASTAL AND OCEAN LAW"). The consistency provision requires that:

> [n]o license or permit shall be granted by the Federal agency until the state or its designated agency has concurred with the applicant's certification . . . unless the Secretary, on his own initiative or upon appeal by the applicant, finds, after providing a reasonable opportunity for detailed comments from the Federal agency involved and from the state, that the activity is consistent with the objectives of this title or is otherwise necessary in the interest of national security.

16 U.S.C. § 1456(c)(3)(A). Here, the State of Connecticut objected to Islander's project, and thereby precluded Islander from obtaining the necessary federal licensing. Islander then appealed the State of Connecticut's objection to the Secretary, arguing that the project is consistent with

the objectives of the CZMA, and the Secretary agreed. *See* Decision at 2, IE001275. Connecticut now asks me to review the Secretary's determination that the project is consistent with the CZMA.

The meaning of the term "consistency" is specifically defined by 15 C.F.R. § 930.121. According to that section, "[a] federal license or permit activity, or a federal assistance activity, is 'consistent with the objectives or purposes of the Act'" if each of three requirements is satisfied: (1) the activity furthers the national interest as articulated in §§ 302-03 of the CZMA in a significant or substantial manner; (2) the national interest furthered by the activity outweighs the activity's adverse coastal effects, when those effects are considered separately or cumulatively; and (3) there is no reasonable alternative available that would permit the activity to be conducted in a manner consistent with the enforceable policies of the state's coastal management program.

The "national interests" articulated in sections 302-03 of the CZMA, codified in 16 U.S.C. §§ 1451 and 1452, include the following:

> (1) to preserve, protect, develop, and where possible, to restore or enhance, the resources of the Nation's coastal zone for this and succeeding generations; (2) to encourage and assist the states to exercise effectively their responsibilities in the coastal zone through the development and implementation of management programs to achieve wise use of the land and water resources of the coastal zone, giving full consideration to ecological, cultural, historic, and esthetic values as well as the needs for compatible economic development . . . ; (3) to encourage the preparation of special area management plans which provide for increased specificity in protecting significant natural resources, reasonable coastal-dependent economic growth, improved protection of life and property in hazardous areas . . . and improved predictability in governmental decisionmaking; (4) to encourage the participation and cooperation of the public, state and local governments, and interstate and other regional agencies . . . in carrying out the purposes of this chapter; (5) to encourage coordination and cooperation with and among the appropriate Federal, State, and local agencies . . . to support State and Federal regulation of land use practices affecting the coastal and ocean resources of the United States; and (6) to respond to changing circumstances affecting the coastal environment and coastal resource management . . . .

16 U.S.C. § 1452.  Section 1451 establishes that "[t]here is a national interest in the effective

management, beneficial use, protection, and development of the coastal zone."  16 U.S.C. §

1451(a).  In addition to several enumerated ecological goals, section 1451 also provides that

"[t]he national objective of attaining a greater degree of energy self-sufficiency would be

advanced by providing Federal financial assistance to meet state and local needs resulting from

new or expanded energy activity in or affecting the coastal zone."  16 U.S.C. § 1451(j).

### 2.    *Legislative History of the CZMA*

The legislative history of the CZMA bears upon the question whether the project at issue

in this case is consistent with the purposes of the CZMA.  Beginning in the 1960s, Congress

became concerned about the stress being put upon coastal land due to increasing industrialization

and pollution.  COASTAL AND OCEAN LAW at 191.  Congress enacted the CZMA in 1972, the

same period as other major federal environmental legislation, principally to protect land and

water resources in the coastal zone.  *Id.* at 192; 16 U.S.C. §§ 1451-52.  The CZMA provides

states with federal funding so that states will monitor coastal land regulation at the state level,

because Congress thought the coastal zone "was an important environmental resource," that the

existing regime of local land regulation was not protecting against "enormous development

pressures."  *Norfolk Southern Corp.*, 822 F.2d at 393.  "The text of the CZMA indicates that

Congress was very concerned about environmental degradation of the nation's coastal resources

and the failure of the local land use regulators to adequately protect those resources."  *Id.* at 394.

Although Congress had various reasons for enacting the CZMA, it "ha[d] as its main purpose the

encouragement and assistance of States in preparing and implementing management programs to

preserve, protect, develop, and whenever possible restore the resources of the coastal zone of the United States." *Id.* at 395 (quoting S. Rep. No. 753, 92d Cong., 2d Sess. 1, reprinted in 1972 U.S. Code Cong. & Admin. News 4776, 4776); *see also* Coastal and Ocean Law at 200 ("Although sensitive to balancing competing interests, it was first and foremost a statute directed to and solicitous of environmental concerns."). The 1976 amendments to the CZMA clarified the national interest in siting energy facilities. Moreover, it is well-established that, although initially aimed at conservation, the statute is a balancing statute – that is, it balances conservation with commercial development. *Id.*

        C.        <u>Whether the Secretary's Decision was Arbitrary and Capricious</u>

Following a careful review of the Secretary's Decision and the voluminous administrative record in this case, I conclude that the Decision was arbitrary and capricious. Although the Secretary (1) considered the three factors relevant to a consistency determination, and (2) considered evidence relevant to each of those factors, he did not (3) demonstrate a reasoned connection between the evidence and his determination. *See Environmental Defense*, 369 F.3d at 201. In reaching this conclusion, I have not substituted my judgment for that of the Secretary; rather, I have carefully inquired into the facts and determined whether the Secretary considered relevant factors. *See Overton Park*, 401 U.S. at 414-16. Bearing in mind the deferential standard of review, I must set aside the Decision and remand this case for further consideration by the Secretary, because he failed adequately to explain or support the Decision with record evidence and neglected to consider important aspects of the problem raised by Connecticut's objection. *Islander East Pipeline Co., LLC*, 482 F.3d at 99, 103, 105 (remanding case to agency to "conduct the type of review contemplated by federal law"). Additionally, the Secretary did not follow

necessary procedural requirements.

1.    *Element 1: Whether the Activity Furthers the National Interest in a Significant or Substantial Manner*

The Secretary concluded that the project furthers the national interest, as defined in sections 302-03 of the CZMA,[2] in a significant or substantial manner, and he considered relevant evidence in connection with that element.  Decision at 3, IE001276.  The Secretary's determination of element one demonstrates a reasoned connection between the evidence and his conclusion, because he considered the meaning of "national interest" under the CZMA and applied the evidence in the record to conclude that the project substantially furthered the national interest in three major ways:[3] (1) the project develops the coastal zone; (2) the project is a sited, coastal-dependent energy facility; and (3) the project will preserve and enhance coastal zone resources.  Decision at 3-10, EI001276-1283.  Citing to previous administrative decisions, the Secretary accurately noted that it is relatively easy for projects to satisfy the national interest requirement, because Congress broadly construed the CZMA to include both preservation and development objectives.  Decision at 4, IE001277.

a.    The Project Develops the Coastal Zone

The Secretary determined that the project develops the coastal zone, Decision at 6,

_____

[2] Sections 302 and 303 of the CZMA were codified as 16 U.S.C. §§ 1451-52.  For clarity of citation, I will cite to sections 302 and 303 as codified.

[3] Connecticut suggests that the Secretary's Decision rested on four national interests.  In fact, the Secretary listed the four interests proposed by Islander, but ultimately rested his Decision on three national interests.  He did not find that greater energy self-sufficiency was an applicable national interest.

IE001279, which is one of the objectives delineated in section 303 of the CZMA.[4]  16 U.S.C. §

1452(1) ("[I]t is the national policy . . . to preserve, protect, develop, and where possible, to

restore or enhance, the resources of the National's coastal zone for this and succeeding

generations.").   Section 302 of the CZMA also defines the national interest: "There is a national

interest in the effective management, beneficial use, protection, and development of the coastal

zone."  16 U.S.C. § 1451(a).  The "coastal zone" includes "the coastal waters (including the

lands therein and thereunder) and the adjacent shorelands (including the waters therein and

thereunder) . . . and includes islands . . . ."  16 U.S.C. § 1453.  Each state "identif[ies] the

boundaries of the coastal zone subject to the management program."  16 U.S.C. § 1455(d)(2)(A).

Connecticut's coastal zone boundary extends along the Connecticut shoreline 1,000 feet from the

mean high water mark.  Conn. Gen. Stat. § 22a-94(b).  Similarly, a "coastal resource" is "any

coastal wetland, beach, dune, barrier island, reef, estuary, or fish and wildlife habitat . . . ."  16

U.S.C. § 1453(2).  Thus, the bottom of the Long Island Sound is a coastal resource in the coastal

zone of Connecticut.

    The term "develop" is not defined in the statute, and there is a dearth of case law on the

subject.  In the "absence of statutory guidance as to the meaning of a particular term, it is

appropriate to look to its dictionary definition in order to discern its meaning in a given context."

*Connecticut v. Clifton Owens*, 100 Conn. App. 619, 639 (2007).  There are various definitions of

---

[4] Connecticut argues that, although the project may develop the coastal zone, it also
threatens certain resources in the coastal zone, and protection of resources is another objective of
the CZMA.  The CZMA has multiple objectives, some of which are in tension with each other.
That does not change the fact that development is a proper objective; Connecticut's concerns
about adverse impact on coastal resources are more properly addressed under the second element.

the term "develop," some of which connote commercial and industrial progress, and some of which imply natural growth. *See* BLACK'S LAW DICTIONARY 462 (7th ed. 1999); WEBSTER'S NEW COLLEGE DICTIONARY 310 (2d ed. 1995). Having gained no clear answer from the dictionary, words must be given their "plain and ordinary meaning . . . unless the context indicates that a different meaning was intended." *Connecticut v. Vickers*, 260 Conn. 219, 224 (2002). Here, the plain meaning of the term "develop" includes commercial improvement. Connecticut argues, in effect, that by placing the term "develop" in the context of other terms, such as "preserve, protect, and restore," the definition of "develop" must have a natural, conservationist meaning. That argument is not supported by the legislative history of the CZMA. Congress intended the CZMA to balance conservation of environmental resources with commercial development in the coastal zone. *See, e.g.*, COASTAL AND OCEAN LAW at 229. In fact, in the context of the CZMA, the term "develop" has been defined to mean commercial improvement. *Id.* ("[T]he CZMA reflects a competing national interest in encouraging development of coastal resources."). *See also Conservation Law Foundation v. Watt*, 560 F. Supp. 561, 575 (D. Mass. 1983) (noting that the CZMA recognizes a wide range of uses of the coastal zones, including economic development).

The Secretary concluded that the project develops the coastal zone, because it would enable the bottom of Long Island Sound to be used in a productive manner, that is, to transport natural gas to be used in energy facilities. The Secretary's reliance on development as a national interest and his application of that national interest to the facts of this case appear to be reasonable.

The consistency regulations require that the proposed activity contribute to the national

interest in a "significant or substantial" manner.  15 C.F.R. § 930.121(a).  The National Oceanic

and Atmospheric Administration's ("NOAA") Rules and Regulations define "significant or

substantial" as contributing to the national achievement of the objections described in sections

302 and 303 of the CZMA "in an important way or to a degree that has a value or impact on a

national scale."  65 Fed. Reg. 77124, 77150 (2000).  A project can be "significant" within the

meaning of the CZMA without being "quantifiably large in scale."  *Id.*  The siting of an energy

facility is "significant."[5]  *Id.*

The Secretary reasoned that the development of Long Island Sound rose to the level of

significant national importance, because the pipeline spanned two states, would affect hundreds

of thousands of people in major metropolitan areas, and would develop the nation's energy

infrastructure.  Decision at 6-7, IE001279-80 (citing FERC comment Letter, at 2, enclosure at 3).

Thus, the Secretary's conclusion that the project would benefit the national interest in a

"substantial or significant manner" was not arbitrary and capricious.

b.      The Project is a Sited, Coastal-Dependent Energy Facility

The CZMA encourages states to maintain coastal management programs that provide for

"priority consideration being given to coastal-dependent uses and orderly processes for siting

major facilities related to . . . energy, . . . and the location, to the maximum extent practicable, of

new commercial and industrial developments in or adjacent to areas where such development

already exists."  16 U.S.C. § 1452(2)(D).  The NOAA regulations explain that "[a]n example of

---

[5] NOAA enumerates three factors to consider whether an activity is significant or
substantial: (1) the degree to which the activity furthers the national interest; (2) the nature or
importance of the national interest furthered as articulated in the CZMA; and (3) the extent to
which the proposed activity is coastal dependent."  65 Fed. Reg. 77150.

an activity that significantly or substantially furthers the national interest is the siting of energy

facilities or . . . gas development." 65 Fed. Reg. 77150. The regulations also explain that energy

facilities inherently have economic consequences beyond the area in which they are located, i.e.,

significant energy facilities have national consequences. *See id.*

Both the CZMA and the NOAA regulations use the term "coastal dependent." The term

"coastal dependent" has been construed broadly in the relevant case law. *See, e.g., North

Carolina v. Brown*, 1995 WL 852123 (D.D.C. 1995) (upholding Secretary's finding that,

although proposed project was not itself "coastal dependent," it would indirectly promote

development of coastal dependent uses); *cf. Millennium Pipeline Co., L.P. v. Gutierrez*, 424 F.

Supp. 2d 168, 177 (D.D.C. 2006) (suggesting broad construction of effects on coastal areas to

include indirect effects). Connecticut defines "coastal dependent" more narrowly to mean "those

uses and facilities which require direct access to, or location in, marine or tidal waters and which

therefore cannot be located inland . . . ." Conn. Gen. Stat. § 22a-93(16). The incentive the

CZMA provides for state participation is that federally sponsored activities in the coastal zone

are supposed to be consistent with the state-created coastal management plan. COASTAL AND

OCEAN LAW at 192. Because Connecticut's plan includes a definition of coastal-dependent, that

definition should guide the determination whether a particular use or facility is coastal

dependent.

Interpreting these authorities, the Secretary determined that the project is a sited, coastal-

dependent energy facility. Decision at 8, IE001281. The term "sited" refers to the energy facility

at issue, in this case, the pipeline itself. *See* 16 U.S.C. § 1453(6)(A) (defining energy facility as

any equipment used primarily for transporting an energy resource, i.e., a pipeline carrying natural

gas). There is no question that the pipeline would be sited in the coastal zone, that is, the bottom

of the Long Island Sound. *See* 16 U.S.C. § 1453 (defining the coastal zone to include the coastal

waters and lands thereunder). The Secretary determined that the Islander project falls within the

CZMA definition of an energy facility. Decision at 9, IE001282. That conclusion is a reasonable

interpretation of the relevant statutory language;[6] thus, the Secretary's conclusion that the project

would be a sited energy facility is not arbitrary and capricious.

The Secretary also concluded that the project would be coastal dependent. He cited

precedent that found a bridge to be a coastal dependent structure, because it spanned a river. He

then analogized the facts surrounding the installation of a pipeline to that of a bridge. Decision at

9, IE001282. Arguably, a pipeline is merely a coastal-sited facility, not a "coastal dependant"

facility, because it does not inherently depend upon the coast to achieve its desired results. The

issue in this case, however, is whether a pipeline transporting gas to Long Island from

Connecticut is coastal dependant. Because any such pipeline requires "direct access to, or

location in, marine or tidal waters" of Long Island Sound, the project meets the definition of a

coastal dependent energy facility.

Finally, the Secretary's Decision addresses why the siting of the pipeline would further

the national interest in a significant or substantial manner. Decision at 9, IE001282. He

reasoned that the energy facility was nationally significant because it would facilitate the heating

of 600,000 homes and meet energy needs for New York City and Long Island. The Secretary

also relied upon the NOAA regulations interpreting the CZMA that explicitly define the siting of

---

[6] An energy facility includes any equipment or facility that will be used primarily for
"transportation of an energy resource." 16 U.S.C. § 1453(6)(A).

coastal dependent energy facilities as an example of a project that furthers the national interest in a significant manner. Decision at 5, IE001278 (citing 65 Fed. Reg. 77150). According to the NOAA regulations, the siting of coastal dependent energy facilities inherently has economic consequences beyond the immediate locality where the facility is located, that is, involves a significant national interest. *See* 65 Fed. Reg. 77150. In light of the NOAA regulations describing the national importance of the siting of energy facilities, the Secretary's determination of these issues was not arbitrary and capricious.

Connecticut argues that the Secretary failed to articulate a sufficient basis for concluding that the project will further the national interest in a significant or substantial manner. That argument is unpersuasive. "[A] project can be of national import without being quantifiably large in scale or impact on the national economy." 65 Fed. Reg. 77150. Moreover, the siting of energy facilities is "an activity that significantly or substantially furthers the national interest." *Id.*

In sum, the Secretary's Decision shows that he considered the proper standards concerning this element, the evidence relevant to this element, and then made a reasoned determination that the factor had been satisfied. As a result, his decision regarding element one was not arbitrary and capricious.[7]

---

[7] In the alternative, the Secretary concluded that the project will preserve and enhance coastal zone resources, because the use of natural gas, a clean burning fuel, would reduce pollution. Decision at 9-10, IE001282-83. The Secretary admitted, that it is difficult to quantify the degree to which the project would reduce pollution, because the degree of pollution reduction is dependent on the development of new power plants on Long Island. The Secretary noted, however, that his decision on element one would have been the same even without considering the effect of pollution reduction. Decision at 10, n. 42, IE001283. Accordingly, I need not address the question whether the project will preserve and enhance coastal zone resources.

2.      *Element 2: Whether the National Interest Furthered by the Activity Outweighs the Activity's Adverse Coastal Effects, When Those Effects Are Considered Separately or Cumulatively*

The Secretary's Decision is arbitrary and capricious because he failed to provide record support for his conclusions regarding the balancing of adverse coastal effects and failed to consider an important aspect of the problem, namely, the adverse effect of the project on oysters. *See Islander East Pipeline Co., LLC*, 482 F.3d at 103 (reasoning that a court may not defer to agency decision when the agency "fails to support its pronouncements with data or evidence").

The Secretary found, by a preponderance of the evidence, that the national interest furthered by the Project outweighs its adverse coastal effects, considering those effects separately or cumulatively. Decision at 10, IE001283; 35, IE001308. The Secretary first considered generally what coastal areas would be affected by the project, as well as by the construction techniques that Islander intends to use. Decision at 11-13, IE001284-86. He then discussed five types of adverse coastal effects that would result from the project: (1) water quality from sedimentation; (2) water quality from release of drilling fluid; (3) shellfish/habitat; (4) shellfish harvest; and (5) wetlands.[8] Decision at 13-34, IE001286-1307. Despite the existence of those adverse effects, the Secretary concluded that the project's adverse coastal effects would be temporary in duration and limited in scope.

That conclusion is not adequately supported by record evidence and is not sufficiently definite. *See Islander East Pipeline Co., LLC*, 482 F.3d at 103 (refusing to defer to agency where agency failed to provide findings and analysis to justify the choices made). Although I may not

---

[8] Connecticut had identified four categories of adverse effects; the Secretary adopted those four categories, but divided the water quality category into two separate categories.

substitute my judgment for the Secretary's, I may not defer to his Decision if he fails to properly support his conclusions "with data or evidence." *Id.* The court may not "supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (citing *State Farm*, 463 U.S. at 43). Applying the deferential standard of review, I conclude that the Secretary's Decision is arbitrary and capricious and remand the case to him for further consideration.

a. The Secretary's Decision

i. Water Quality from Sedimentation

The Secretary examined the possibility that fine particles of sediment from the floor of the Long Island Sound ("Sound") could easily become re-suspended in the water during the construction process. Decision at 14, IE001287. Islander's proposed construction techniques, including the use of dredging, the subsea plow, cables, and anchors, will cause an increase in the turbidity of the waters. Increased turbidity tends to cause re-suspension of sediment into the water column, which affects water quality by reducing dissolved oxygen levels and reducing the depth of light penetration. Increased turbidity could also release contaminants from the Sound bottom.

First, with respect to the possibility of the release of contaminants from the Sound bottom, the Secretary considered evidence that there was a moderate level of contamination in the sediments in the construction area. Decision at 15, IE001288 (citing Final Environmental Impact Statement ("FEIS")). He also examined record evidence indicating that, even after the increased turbidity due to construction, the level of contamination would remain below state water quality control standards. *Id.*

Next, concerning the impact to water quality, the Secretary concluded that "the increase

-18-

in turbidity will result in only limited, temporary adverse impacts on water quality." Decision at

16, IE001289. Connecticut raised the possibility that a storm event could increase the duration of

increased sediment suspended in the water column. The Secretary acknowledged that possibility,

but noted that the FEIS had accounted for the possibility of two northeaster storms occurring

during construction, and nevertheless predicted temporary and limited damage from increased

turbidity. Decision at 16, IE001289.

<blockquote>ii.    Water Quality From Drilling Fluids</blockquote>

The Secretary also considered the effects of the release of drilling fluids. Decision at 17,

IE001290. The release of drilling fluid increases turbidity in the water, particularly when

released under very high pressure, in incidents known as a "frac-outs." Drilling fluids contain

bentonite clay, rock cuttings, and water, and, when released, form a gel-like layer on the bottom

of the Sound that can smother shellfish. Still, the Secretary concluded, based upon Islander's

proposed construction techniques and contingency plan, that the release of drilling fluid would

result in limited, temporary adverse effects on the water quality. Decision at 18, IE001291.

<blockquote>iii.    Shellfish Habitat</blockquote>

After considering evidence about the adverse effects on the shellfish habitat, the Secretary

ultimately concluded that the project will result in temporally and spatially limited adverse

effects on shellfish. Decision 23, IE001296.

The Secretary considered Connecticut's concern that the pipeline will cross shellfish lease

areas in Connecticut's waters. Decision at 20, IE001293. He considered that the oyster and clam

industry is a multi-million dollar enterprise in Connecticut, with Connecticut ranking first in the

nation in terms of the dollar value of oysters harvested. Decision at 21, IE001294.

The Secretary recognized that there is record evidence proving that there will be adverse impacts to the shellfish habitat. The principal damage will occur in the area of the Sound floor where the pipeline is actually installed, as well as to surrounding areas where anchors and cables strike the Sound floor. Connecticut, the National Marine Fisheries Service ("NMFS"), and the Fish and Wildlife Service ("FWS") believe that it may take more than five years for the shellfish habitat to recover, and that the damage may be long-term. Decision at 22, IE001295. The pits created by anchor strikes can become anoxic, and therefore unable to support shellfish. The Secretary recognized that there is evidence that the dredging and subsea plowing can cause direct mortality to the shellfish in those areas, and it is possible that the shellfish in the immediate pipeline area will never recover. Decision at 22, IE001295.

### iv. Shellfish Harvest

The Secretary also considered Connecticut's concern that the use of backfill gravel will render 5.5 acres unsuitable for commercial shellfishing equipment, due in part to topographical irregularities. Decision at 31, IE001304. He concluded that, based upon the measures Islander proposed to mitigate those effects, as well as the lack of support for Connecticut's position, the project's impacts on commercial shellfish harvest would be minimal. Decision at 33, IE001306.

### v. Wetlands

Finally, the Secretary considered Connecticut's concern about potential damage to two coastal wetland areas (CT-A37 at Mile 9.6 and CT-A21 at Mile 9.8). The Secretary reasoned that, because Islander would monitor the wetlands for three years following construction to make sure they are restored, the damage to the wetlands would be mitigated, and would therefore be minimal. Decision at 33, IE001306.

### vi.    Cumulative Effects

Citing to prior administrative decisions, the Secretary explained that cumulative effects mean "the effects of an objected-to activity when added to the baseline of other past, present and reasonably foreseeable future activities occurring in the area of, and adjacent to, the coastal zone" of the area in which the objected-to activity has taken place.  Here, the Secretary found that there was no evidence in the record that there were other past or reasonably foreseeable future activities within the meaning of the term cumulative effects.

Although there are adverse effects caused by the project, the Secretary concluded that, because of their limited scope and duration, the adverse effects do not outweigh the national interest furthered by the project when considered separately or cumulatively.

### b.    Why the Secretary's Decision is Arbitrary and Capricious

The Secretary concluded that the national interest outweighed the adverse coastal effects just discussed because those effects would be limited in scope and temporary in duration.  That conclusion is not supported by evidence or data, and is therefore arbitrary and capricious.  *See Islander East Pipeline Co., LLC*, 482 F.3d at 103.

First, with respect to the scope of the adverse effects, Connecticut estimated that 3,700 acres of its waters would be affected by the construction of the pipeline.  Islander estimated that only 1,121 acres would be affected.  The Secretary "conclude[d] that Islander East's estimates are more credible," and he used those estimates to make his conclusions regarding the scope of adverse effects.  Decision at 24, IE001297.  The Secretary did not explain why Islander's estimates were "more credible."  There is no reasoned connection between his conclusion and any record data.  Moreover, the Secretary's conclusion that Islander's estimates were "more

credible" is inherently flawed because the Secretary did not hear live testimony, but rather relied upon the paper record; he was therefore not in a position to judge credibility. Thus, the Secretary failed to provide a reasoned basis for his pronouncement that the area affected would only be 1,121 acres. *See Islander East Pipeline Co., LLC*, 482 F.3d at 103. That pronouncement was, in turn, the basis for the Secretary's conclusion that any adverse coastal effects would be limited in scope. Accordingly, that conclusion is also unsupported by data or evidence, and as a result, I cannot defer to the Secretary's conclusion that the project's adverse impacts would be limited in scope. *See id.*

Second, the Secretary's conclusion that the adverse effects would be temporary is not supported by the record. He cites the FEIS, which provides that the recovery of shellfish beds would take *"at least* 3 to 5 years, the time it takes for a settled clam or oyster to reach marketable size." Decision at 26, IE001299 (emphasis supplied). Significantly, the Secretary does not say that recovery will take about three to five years; rather he says it will take *at least* three to five years.

That statistic is tautological and meaningless. The statistic is tautological because, after clams and oysters are killed off, it would take a minimum of three to five years for new shellfish to grow to marketable size, if recovery began immediately. The statistic is meaningless because it says nothing about the actual time it will take for substantial numbers of clams and oysters in the affected area to recover. The Secretary's statement thus expresses the truism that no clam or oyster will recover before three years, but the Secretary made no determination that affected shellfish would recover in the short term. Recovery would be consistent with a prediction of *at least* three to five years if it took 10 years, 100 years, or 1,000 years for the shellfish to recover.

-22-

Indeed, if the shellfish never recovered, that would take *at least* three to five years. Saying that it will take "at least" three to five years for shellfish to recover is not a prediction that shellfish will ever recover, but rather is a speculation that, in effect, in the event the shellfish happen to recover, it will not happen faster than the time it takes the shellfish to reach marketable size. In short, the Secretary does not rely on any scientific data to underpin his conclusion that the adverse effects on shellfish will be temporary. A close reading of the Decision reveals that, although he mentions the number three to five years, that number is just a floor, not a ceiling, and more fundamentally, the Secretary does not even point to any evidence that the shellfish will ever recover.

The Secretary also determined that "recovery of anchor scars *could* occur within a year, or could take several years." Decision at 27-28, IE001300-01 (emphasis supplied). The use of the word "could" implies that the anchor scars might recover, but then again, they might not recover for some significant period of time. The Secretary has said nothing definitive about the duration of the adverse coastal effects caused by anchor scars. As a result, his broader conclusion that the adverse coastal effects would be limited in duration is not supported by the record; there is no reasoned connection between the conclusion that the adverse effects on shellfish and water quality will be temporary in duration and that therefore, those adverse effects are outweighed by the national interest.

Third, the Secretary failed to address an important aspect of the problem because he effectively ignored the adverse effects on oysters when concluding that the adverse effects on shellfish would be temporary. *Islander East Pipeline Co., LLC*, 482 F.3d at 94-95 (explaining that a decision is arbitrary and capricious if it fails to consider an important aspect of the

problem). The Secretary acknowledged that oysters have not returned to the Sound after construction of the Iroquois pipeline in 1991. Decision at 27, IE001300. Moreover, in concluding that the Sound bottom will recover, the Secretary generally refers to "organisms," "shellfish" or "clams," but not oysters. *See, e.g.*, Decision at 29, IE001302. Concluding that there is evidence that "organisms" will return to the Sound bottom says nothing about whether oysters will return. Although the Secretary refers to oysters generally throughout his Decision, he never cites scientific data predicting that oysters will return to the Sound bottom after construction, or even that oysters will likely return. For example, the Secretary writes that it would "take at least 3 to 5 years, the time it takes for a settled clam or oyster to reach marketable size." Even though he uses the word "oyster," the Secretary is not predicting that oysters will return to the Sound bottom, nor is he citing data supporting the conclusion that oysters will likely return.

Connecticut ranks number one nationwide in the dollar value of its oysters. IE006095. The destruction of oysters, therefore, is significant in balancing the adverse effects of the project against the national interest. Still, the Secretary does not cite one scientific study that predicts that oysters will return to areas affected by the project, and the opinions he does cite do not refer to oysters at all, but use the general term "organisms." With respect to his discussion regarding oysters, the Secretary's "brevity is troubling." *Islander East Pipeline Co., LLC*, 482 F.3d at 104. Indeed, he almost entirely fails to consider the issue of oysters, and certainly provides no record support for the conclusion that the damage to oysters would be temporary. *See id.* at 103, 104, and 105. In *Islander East Pipeline Co., LLC*, the Second Circuit remanded the case, in part because the agency "fail[ed] to identify with any specificity the shellfish communities that would

-24-

be impacted by the pipeline." *Id.* at 101. That is exactly what the Secretary failed to do in this case. "There are no findings and no analysis here to justify the choice made, no indication of the basis on which the agency exercised its expert discretion." *Id.* at 103 (quoting *State Farm*, 463 U.S. at 48). As a result, the Secretary's Decision is arbitrary and capricious, and I must remand the case to the Secretary for further consideration of the impact of the pipeline on oysters.

Fourth, there are various miscellaneous problems with the Secretary's Decision. For example, he concludes that the damage to wetlands will be mitigated because Islander is going to "monitor" the wetlands. Monitoring the wetlands will not bring the wetlands back; mitigation requires more than the collection of information. Further, there are no data cited to support the conclusion that the wetlands will be restored, even if they are, in fact, "reseeded." *See* Decision at 33, IE001306. In addition, the Secretary does not distinguish between organic sediment and inorganic sediment, and the different effects that each may have on benthic organisms in the Sound. *See, e.g.*, Decision at 14-16, IE001287-89. Finally, the Decision is replete with generalities and vague statements ostensibly cited to support the Secretary's conclusions, but in reality, failing to say much of anything. For example, he cites testimony of Dr. Zajac, considering that "if the projections are correct" then sediment deposits should have little effect on the Sound bottom communities. Decision at 30, IE001303. That citation begs the question, "What data are there to suggest that the projections are correct?" The Secretary also uses the term "could" repeatedly, indicating that his conclusion is vague and indeterminate. *See, e.g.*, Decision at 28, IE001301 (discussing recovery of benthic organisms).

In sum, the level of care given to balancing the adverse effects against the national interest is insufficient. In order for me to uphold the Secretary's Decision, there would need to

be "a rational connection between the facts found and the choice made." *See Islander East Pipeline Co., LLC*, 482 F.3d at 104. Here, there is no rational connection between the record evidence and the conclusion that the adverse effects will be temporary or limited in scope. Having conducted "a thorough, probing, in-depth review," *see Overton Park*, 401 U.S. at 415, I conclude that the Secretary's Decision is not sufficiently supported by data, and he failed to consider an important aspect of the problem. Therefore, I remand the case to the Secretary for further consideration, so that he can "conduct the type of review contemplated by federal law," meaning that he must provide record support for his conclusions and consider all important aspects of the problem, including the effect of the pipeline construction on oysters. *See Islander East Pipeline Co., LLC*, 482 F.3d at 94-95, 104, and 105.

3.      *Element 3: No Reasonable Alternative Available*

The Secretary also considered the third element required for the consistency analysis and concluded that there was no reasonable alternative to the project. Connecticut did not challenge that aspect of the Decision. Nevertheless, I conclude that the Secretary's Decision on this point is arbitrary and capricious because his analysis does not justify his determination. *See Islander East Pipeline Co., LLC*, 482 F.3d at 103 (quoting *State Farm*, 463 U.S. at 48). Because I am remanding the case under element two anyway, the Secretary should also reconsider whether there is a reasonable alternative available.

The CZMA gives priority to new energy facilities, but requires, to the extent practicable, that they are to be installed adjacent to existing facilities. 16 U.S.C. § 1452(2)(D) ("[P]riority consideration [should be] given to coastal-dependent uses and orderly processes for siting major facilities related to . . . energy, . . . and the location, to the maximum extent practicable, of new

-26-

commercial and industrial developments *in or adjacent to areas where such development already exists*.") (emphasis supplied).  The last clause in section 1452(2)(D) refers to locating energy facilities and industrial developments adjacent to existing development.  Moreover, the legislative history of the CZMA suggests that development should occur, to the maximum extent practicable, in areas where development already exists.  *See* COASTAL AND OCEAN LAW at 200 ("Although sensitive to balancing competing interests, [the CZMA] was first and foremost a statute directed to and solicitous of environmental concerns.").  Even though the CZMA has also incorporated development goals, it is, nevertheless, a balancing statute that seeks to balance conservation with commercial development.[9]  *Id.*

There is an existing pipeline that spans the Long Island Sound, originating in Milford, Connecticut with the potential to expand to include the Islander project.  Combining the Islander project with, or siting the Islander project adjacent to, the existing Iroquois pipeline would further the statutory purpose of concentrating commercial and industrial development in the coastal zone, and presents a potential way to minimize the adverse effects of the Islander project.  The principal reason why the Secretary rejected the Iroquois pipeline location as a reasonable alternative is that Islander would have to obtain permission from Iroquois to proceed.  The Secretary reasoned that, because Islander cannot *compel* Iroquois to allow it to piggyback on the existing pipeline, this is not a reasonable alternative.  *See, e.g.*, Decision at 43, IE001316.  That analysis is puzzling.  There is no evidence whatsoever that Islander even attempted to obtain permission from Iroquois.  The Secretary concluded that Islander might not be able to transport

_____

[9] The Secretary did not even address that point in his Decision when considering whether a reasonable alternative is available.  As such, he failed to consider an important aspect of the problem – namely, the purpose of the statute.

the same volume of gas if it uses the ELI System Alternative, but he fails to consider that Islander could seek permission to increase the ELI System capacity. There is no suggestion in the record that such a request would be denied. Thus, it is arbitrary to find that the ELI System is not a reasonable alternative, when no investigation of the feasibility of that alternative has been undertaken.

The Secretary concludes that "the incremental benefits of the alternate route do not outweigh its costs." Decision at 49, IE001322. That conclusion is not supported by the record evidence, particularly because the Secretary's Decision that the adverse effects of the Islander project would be limited in scope and temporary in nature was not supported by data or evidence. The Secretary's Decision that no reasonable alternative exists is almost entirely based upon the premise that Islander might not be able to compel another company to allow Islander to construct its pipeline alongside the existing pipeline or to upgrade the capacity of the existing pipeline – a premise unsupported by the current record.

### 4. *Procedural Problems*

Under the APA, a reviewing court will set aside agency action found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). The Secretary must provide interested Federal agencies, including the Federal agency whose proposed action is the subject of the appeal, with an opportunity to comment on the appeal. 15 C.F.R. § 930.128(b). "[A]n utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure." *Sprint Corp. v. F.C.C.*, 315 F.3d 369, 376 (D.C. Cir. 2003) (quotations omitted). "The necessary predicate is that the agency has alerted interested parties to the possibility of the agency's adopting a rule different than the one

proposed." *Id.* Connecticut argues that I should set aside the Secretary's Decision, because he failed to follow proper procedures for providing a notice and comment period.

In January and March 2003, the Secretary sent letters to 16 federal agencies, including NMFS and FWS, requesting comments on the project. In May 2003, Islander requested a remand to the State of Connecticut, so that it could ask Connecticut to reconsider its objection, in light of certain proposed installation modifications.[10] On June 17, 2003, the Secretary published notice of the remand in the Federal Register, indicating that the comment period would be reopened, in light of the remand. The notice in the Federal Register indicated that the remand was based on new information submitted by Islander, but Connecticut argues that the notice was insufficient, because it did not detail the nature of the modifications to the project. The Secretary also sent letters to six federal agencies that had not yet commented on the project. He did not send letters to agencies that had already commented. In November 2003, the Secretary sent letters to 16 federal agencies, including NMFS and FWS reopening the comment period for a mere six days.

Connecticut argues that, after the appeal was reinstated following remand, the Secretary should have started the notice and comment period all over again, because the administrative record had changed significantly. The Secretary argues that he followed proper procedures, and additionally, NMFS and FWS had actual and constructive notice of the remand, because NOAA sent a letter advising the Secretary of the Interior that the appeal had been remanded to Connecticut. Additionally NMFS was present at meetings when Islander presented information

---

[10] It should be noted that the Secretary relied upon those modifications in reaching his Decision.

about the project modification.

Connecticut cites *Sprint Corp.*, 315 F.3d at 377, for the proposition that I should vacate the Secretary's Decision and remand the case to him for further consideration because he did not follow the proper procedural requirements. In *Sprint Corp.*, the agency did not give notice that it was intending to adopt a different rule than the one originally proposed. *Id.* Here, the Secretary gave notice in the Federal Register that the case had been remanded based upon new information submitted by Islander, but did not describe the nature of that new information.

That failure is material because the Secretary's Decision is based almost entirely on the new information submitted by Islander. There are several instances where the Secretary reasons that he might have come out a different way, but because Islander submitted revised information, that new information supports his conclusion. *See, e.g.*, Decision at 25, IE001298 (discussing a different trench size than that proposed in the FEIS). Moreover, the Secretary repeatedly cites criticism by various entities, as well as information in the FEIS, but then discounts that criticism and the concerns delineated in the FEIS because it was based on the old information, rather than the revised information Islander later submitted. *See, e.g.*, Decision at 15-16, IE001288-89; 23, IE001296; 26, IE001299. Because the Decision so heavily focuses on the impact of the revised information and why that information is material to the Decision, the Secretary should have started the notice and comment period all over again. His failure to do so creates uncertainty about the effects of that failure and independently requires setting aside the Decision. *See Sprint*, 315 F.3d at 376.

III.    **Conclusion**

Connecticut's motion for summary judgment (**doc. # 26** ) is **GRANTED**; the Secretary's

motion for summary judgment (**doc. # 31**) and Islander's motion for summary judgment (**doc. #30** ) are **DENIED**. The Decision was arbitrary and capricious and is set aside. This matter is remanded to the Secretary for further proceedings consistent with this ruling. The clerk shall close this case.

It is so ordered.

Dated at Bridgeport, Connecticut, this 15th day of August 2007.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge